Mr. Randell, may it please the Court. My name is Blair McCune, and I've been appointed by the Court to represent the defendant appellant, Mr. Kenneth S. Alexander. At the Court's pleasure, I will go through the issues as they were presented in my brief. I'd like to preserve five minutes for rebuttal if I'm able to do so. However, I believe there's kind of one common thread that exists through this case, and that is how the trial court dealt with Mr. Alexander, the situation as presented by someone who is representing himself at trial. The first issue that was presented to me as I became involved with the case after I was appointed, and I reviewed the record that there did not appear to me to be a ruling by the district court on Mr. Alexander's motion to suppress evidence. There were two motions. Did he renew his objection when that evidence was introduced at the trial? I couldn't see any indication of that. Your Honor, I don't believe that he did. I know that that is an issue. I read Professor Lefebvre's commentary on renewing objections at trial. As Professor Lefebvre said, it's not a common requirement to have to renew objections at trial. He did file these very lengthy. But wasn't Lefebvre talking about the more typical situation where the motion to suppress is filed, the district court denies the motion, and then the evidence is introduced, and the question for appellate review is whether or not the pretrial motions and hearings preserve the issue so that it can be challenged on appeal. Here we have a slightly different problem. The argument is that there was no ruling and, therefore, does counsel, and I'm assuming the same rules apply to Mr. Alexander, notwithstanding that he was pro se. Doesn't he have an obligation to remind the trial court by way of a timely objection when the evidence is sought to be introduced against him that the court still hasn't  Your Honor, I remember one point in the record where Mr. Alexander was objecting or talking about the motions to suppress, and Judge Beisselein said, well, that's over with. You're, you know, you've been, it's been ruled against you. And why isn't that been sufficient to indicate that the court has now denied the motion and it's coming in? I think it's the importance of the right to have a district court judge clearly and definitively decide the motion. The United States person Decide the motion or articulate the reasons for the ruling so that if it, if the substantive merits of the ruling are challenged on appeal, we as appellate judges will have a perfected record that we can review so that we can understand what the district court did. And I understand it here. You're not challenging the merits of the district court's ruling. You're challenging the procedural failure to simply issue an order denying the motion. Am I correct? I believe that there are merit issues that But you haven't argued them in your brief. I haven't argued them in my brief. Then why haven't you waived any challenge to the merits of the motion? The right to have the district court thoroughly and fairly review the motion itself is an important right. I did not argue in the alternative. I believe it's up to Judge — I believe so strongly that it's up to Judge Beislein that it's a district — the United States v. Raddatz case says that the district court's responsibility alone, and the U.S. Supreme Court uses that term advisedly alone, to decide the motion, is the defendant's right. What's our standard of review when we review it? Do we review it de novo? Yes. It's a question of why. Why can't we just look at it and say, well, we'll do it ourselves now because we'd be doing it de novo anyway? To me, it — I just have to go back to what Raddatz says. And Raddatz says it's not the court of appeals, it's not the magistrate, it's the district court judge who has the responsibility to rule on these motions. It's an Article III issue. Well, we're Article III judges. I won't disagree with that. But I do want to bring up one other matter on this motion, and this involves candor to the tribunal. I wrote a letter to the court. What happened is I was in the final phases of doing my reply brief. I went down to the jail, talked to my client. He said there was something that happened just before jury selection. And I am concerned that that might be — might well be a ruling. I listened to the CD on it. And, you know, it's my duty as a counselor to give candor to the tribunal. I'm concerned that that might be a ruling. And is that something — Is that what you were — No, go ahead. Is that what you were referring to earlier when you said the judge said — No, that was a trial. That was a trial. I — you know, it — as I briefed the case, it was clear to me, and I went through the portions of the record that the government cited and addressed those all in the reply brief. And I don't — I stand that on the record that I had, there was no ruling. But I'm concerned about this part of the record. So is this a part of the record that was not transcribed and included in the excerpts of record? Yes, that's correct. Now, as far as I can tell, that proceeding was denominated jury selection. And I don't know — I don't — I'm not familiar enough with the way that transcribers do this in Federal court or the sufficiency of log notes and so on. But obviously, the log notes just probably said jury selection, and the transcriber said, okay, don't have to transcribe that. Well, we very much appreciate your candor. Just for purposes of our own de novo review, if we decide that's what we ought to do, can you give us — it's what, listed in the docket sheet as the court reporter's at least rough — or as a recording of the jury selection? Is that where it is? Yes. When I wrote the letter to the court, I attached the part of the transcript that wasn't transcribed. Oh, I'm sorry. I'm not sure I saw that. Did you file a Rule 28J letter with that attached? Is that what it was? I believe that's — What date was that? I wrote a letter to the court. What date? The date that I wrote — oh, the date — Of the letter. The date of the letter was — I don't have it right in front of me. It was, like, very shortly after I filed the reply brief. I had talked to Bar Counsel and decided I should send it over. I don't recall seeing it. I don't either. If you could send us three copies, and you can address them direct — just address them to the three of us, but send it to the clerk in San Francisco, and it will get distributed to us. That would be very helpful, Mr. McCain. I will do so, Your Honor. Thank you. Turning to the next issue, again, there's a matter. This — the second issue that I wanted to argue is a subpoena for the judicial officer. This involves a State court warrant by which Mr. Alexander's 1999 work Taurus was searched. The — again, there's a factual issue that has arisen. The judicial officer was District Judge Samuel Adams of Anchorage. And, tragically, he passed away of a heart attack on a hunting trip last year, probably about six or eight months ago, I believe. I believe that a remand still would clarify this matter. There might be something in the way of handwriting examplars or someone who would know the signature. But the problem, as I understood it from your briefing, was that Judge Adams might have erred in affixing the wrong date to the warrant papers. Mr. Alexander's motion argument on this as a pro se defendant was that they — that this warrant might — may well have been a sham. No, no, no. We understand that. But I guess the question I'm trying to determine, it sounded to me, if you're correct, that we should have heard testimony to address Mr. Alexander's concern that we would need the testimony of Judge Adams to verify that he did, in fact, issue the warrant and that he perhaps may have erred in entering the date in one or more places in the — That's essentially it. Or that he — you know, I've never seen this before. Right. So a handwriting exemplar maybe could tell us that that is, in fact, Judge Adams' signature, but it wouldn't resolve the mystery surrounding the error in the date. That's true. There might be some court calendar records that could help clear things up, though. Okay. And I would think that a — But I take it we don't need to reach that issue if we find that there was some recognized exception under the Fourth Amendment to the search. Is that right? Your Honor, once again, I stick with my argument that Raddatz, you know — No, no, I understand it. But if we were to rule against you on the Raddatz issue, then do we need to reach this issue at all? I believe it's a — if — what I see has happened is that the magistrate judge made a decision about the search warrant. He said the police officer was there, the police officer testified. I found that it's not a sham warrant, it's a valid warrant. Mr. Alexander, and the district court judge never ruled on that issue, arguably. Certainly not a written ruling. So I think this ties in with the Raddatz case as well. The next issue I'd like to talk about, which is perhaps the most pressing issue here, is the civilian clothing at trial. This is — there's no question that a due process right exists, and there's no question about that a defendant, since Estelle v. Williams, has a right to appear out in civilian clothing, not jail guard. The issue here is whether there was a waiver. The government claims that Mr. Alexander had a — was using a sympathy tactic type of rationale. In other words, he thought if he appeared in jail guard, the jury might have sympathy to him. Counsel, do we know how the — do we know the description of the jail clothing? No. We don't have a record on that. He was a pro se — representing himself pro se, and he didn't ask for photographs. He didn't ask — he didn't make a description in the record. And I have to be — Well, I have to say, Judge Canby has a lot more experience hearing appeals than I do, but this is the first one in five years I've had where the defendant actually asked to appear in shackles. This is a first for me. I don't — Your Honor, I — if you — there's a number of ways to read the record. Okay? He — you could see him be accommodating toward the district court judge. He — the — I don't think that the record shows that he asked to be in shackles. What he said was, I — I — well, I'd say leave them on. I want the shackles. You know, I mean, it's a requirement. Let's — we don't want to break the court's requirements. Okay? Judge Beislein says, well, I don't want you to put words in my mouth. I'm making accommodations. And then they go into the jail clothing. Okay? And — and he says, so you're going to wear your jail suit then. And I — you know, although it isn't clear exactly what it is, a jail suit is, you know, usually a jail suit. We assume it's a jumpsuit of some sort. Jumpsuit type of thing. But in combination with the shackles, it's going to be pretty clear to the jury this guy's in custody. Yeah. But I — he — I don't — again, the record's not absolutely clear, but I'm quite sure that he was not in shackles during the trial. There were bench conferences. He was going up and back and forth and talking to people. It just — it just seems very obvious that he was not in shackles. But Counsel, didn't he draw — in his opening statement, he drew attention to the fact that he was in jail. Yeah. Your Honor, I think he — that's true. But I think he was making the best of a bad situation. He — and the thing that's most troubling to me, at least, about this, is the trial court's attitude on the — when he — when he's finally — when he said, hey, I'd like to get civilian clothing. Well, he said, I want to order a suit. He brought a catalog in. He said, can I get — give me a magazine. Let me see. I'd like to order something. I'd kind of like to order a suit. And then the judge says, I'm not going to take care of your clothing. That is the wrong answer. That — and defendants — You're not — I mean, you're not going to take care of my clothing? No. Well, Mr. McKeon, you're not suggesting that under the Criminal Justice Act, the court has an obligation to expend CJA funds to buy him a suit, are you? Yes. The court has an obligation to expend some court money to get some civilian clothing for this man. Does it have to be a Nordstrom suit, or can we get it off the rack? No. I think you can go to Value Village, spend $10, and get the man some clothes. I mean, what — the remedy here is so simple. Or go to the Federal Public Defender's Office where they have suits and — Clothing. You know, clothing. And get some clothing for the man and let him go. Counsel, that's part of the peril of self-representation. You know, an attorney would have known, you know, how to resolve this issue. I mean, I'm not sure that — I mean, that the judge has to respond to a request, a mail to order a suit in that way. I'm just — I mean, we're looking at, you know, whether or not this was a violation of his constitutional rights. Right. But what happens immediately after that, I think, is critical. And that's where the judge says, well, you look good. You look good. There's not going to be any secret in that you're not in custody. Okay? Well, when the judge said you look good, that kind of triggered in my mind how the jail clothing looked, because normally jail clothing does not look good. And so that's why I asked the question as to the description of the jail clothing, because some jail clothing is a shirt and a pair of pants. And I didn't know whether the judge's reference to that indicated that the jail uniform wasn't necessarily identifiable as such. He was in a pretrial facility, and there's no pants and shirts allowed in pretrial facilities in Alaska. Well, what are we talking about? I mean, you practiced in Alaska. Of course, what are we talking about? Are we talking about jumpsuits? Probably a blue jumper with a v-neck and blue kind of sweat, you know, lighter fabric sweatpants. Probably some shoes that are, you know, like sandal loafers, but, you know, sneaker-type fabric shoes. Probably blue. Is the clothing stenciled? If you're in trouble, they'll be orange, but... For high security reasons. Yeah. And is the clothing stenciled at all? Does it say, you know... It is now, but I don't believe it was at that time. It might say CIPT on the back or Anchorage Jail on the back. But I just want to go back to this question because, you know, the judge should be neutral in this. You know, it's not right. It's just not right to say, you look good. The jury's going to know anyway. It's almost persuading the defendant and taking the decision away from the defendant. It's encouraging the defendant to remain in this type of clothing. I think that this steps out of some neutrality, and I don't know whether, you know, obviously... You have the Feltz case authority to support your argument on this issue. The Feltz case at the LTS is this Court's case. And I cited it in my briefing. And basically, we, of course, have some disagreement about how it should be read. But the way I read it is you can... In Feltz, the Court noted the defendants may choose to dress in jail clothes to attempt to elicit sympathy from the jury. But this Court also concluded that in order to find such a tactic was employed, the record had to show that the defendant had clothes available and elected not to wear them. And that's not what happened here. He's not like in the old days. He's told no. Okay? In the old days, we had this phrase, I take exception to that. Counsel, if we agree with you, why is this error not harmless? I can't imagine how it could be harmless error to show up in jail clothes. It's something every defendant, every defense attorney, in their right mind, the boys like to play. It's just the effect on the jury is so overwhelming. It's just like he's a criminal, he's a criminal, he's a criminal all the way through the trial. I suppose the harmless, I haven't seen any harmless error cases in this arena. But I'd say it's a due process right, certainly. If there was harmless error, that would be unreasonable doubt. Excuse me. It fails to be recognized that the possibility of harmless error in Note 5. Yeah. I don't have that in front of me. I think since it's a due process right, it would have to be harmless error beyond a reasonable doubt. Right. Do you want to say something? I would love to say something. Thank you very much, Your Honor. Thank you, Mr. McHugh. Mr. Randall. Thank you. May it please the Court. I can tell you a little bit about Mr. Alexander. I'd like to take just a couple of minutes to give you my impression as to what this case was about and what Mr. Alexander's strategy in this case was. Essentially, this was a fairly simple case. It started out with Mr. Bradley and Mr. Alexander getting together and deciding they wanted to make some money. Mr. Alexander was a software guy. He was the computer guy. Mr. Bradley had a bank account at the time, so they decided they'd set up this little kite scheme. And Mr. Alexander convinced Mr. Bradley, well, if things go bad, you can declare bankruptcy. And this little scheme grew. And it eventually involved a bunch of other people, primarily women, who were addicted to crack cocaine, as was Mr. Bradley and Mr. Alexander. All of these people involved in this little scheme to manufacture and pass counterfeit checks were drinkers and crack smokers. Mr. Randall, we've read the brief. We're familiar with the background. Could you turn to the issues that are raised on appeal here? All right. Well, first off, we have the admissions. All right. I will go into the issue. Let's talk about the clothes. Did you try this case? Yes. The clothes and the shackles are basically one issue. I don't think you can separate them. And Mr. Alexander clearly said to the Court, I want shackles left on. Were they? Were they left on during trial? You know, I was thinking about that, and I don't remember. I remember the clothes. It was a blue jumpsuit. I don't remember any stenciling or any lettering on them. And I don't remember if he was in shackles or not, to be perfectly candid. But I do know this. I know it was part of Mr. Alexander's strategy to specifically let the jury know that he was in jail. And I want to read you a few of his comments in his final argument to the jury, because this is his version of what this case is all about. He says essentially that this whole case was a government conspiracy to frame him with regard to these charges. And he says that. He starts it. This is in Volume 5 of the transcript. And when I get done with my opening, Mr. Alexander stands up, and he addresses the jury, and he says, Well, I've got a nice, neat little package all tied up, only it didn't come out right. What's done in the dark usually comes to light. And he talks about himself a little bit, and he talks about the fact that he was a whistleblower, that he blew the whistle on a very powerful person in our state, went to the FBI. The FBI, the government turned on him, and he ended up representing himself. Why did he do that? Because he didn't trust anybody. So he says, I'm here representing myself because I'm the only one who can tell you the truth. There's no lawyer. I wouldn't trust anyone to come forth and handle this for me. I had to do it myself because these people are liars. They manipulate everything. Okay, counsel, on the clothing issue, that was all before. What about opposing counsel's argument that he was trying to make the best of a bad situation after he was forced to appear in jail clothing? Were you there when the colloquy took place regarding the jail clothing? I was there for all of it. But here's what he said to the jury about the clothing. I want to address the issue before he got to the jury, because opposing counsel's view is, Okay, by the time he got to the jury, he was making the best of a bad situation. He wasn't giving any civilian clothes. So at the point when the colloquy took place between the judge and the defendant regarding the civilian clothing, what's your take on that? Judge Beislein spent a lot of time talking to Mr. Alexander, and he bent over backwards for him. There was discussion about the clothing, and then there was discussion about the shackles, and there was extensive discussion about the shackles. Can we stick with the clothing issue? The clothing issue was there was not a lot of time spent on the clothing issue. I mean, I can't get around that. I mean, there was not extensive discussion between Mr. Alexander and the court about the clothing. Do you think the district court erred in saying, I'm not going to take care of your civilian clothing request? No, because he made that decision in context with everything else. You can't just look at that little issue all by itself, because you've got the shackles that go along with it and his whole interaction with Mr. Alexander. You see, Alexander, part of his strategy was being in jail, to the extent that he lied to the jury about the fact that he was in jail and why he was being kept in jail. He lied to them, and it's right in the transcript. And this is what I was getting to. It goes to this whole issue of the clothing. He says, look at me. I'm in jail. No bail. I heard these women stood up there and say they were afraid of Bradley. And a bunch of women said they were afraid of Bradley. And Bradley's out running around. Look at me. Here I am in jail. I'm being held as a danger to the community, says he. I'm a flight risk. Well, wait a minute. If you go into the docket to the excerpt of record, you see that, in fact, Mr. Alexander was originally granted bail. The magistrate judge set a $7,500 unsecured bond for him, and he got out. And then he screwed up within a week, and he's back in jail. So you see, this jail business, what he says to the jury, he uses that as a ploy. It's not sympathy. He's not trying to have the jury sympathize with him. It's part of the conspiracy of the government to screw him. I mean, that's his strategy in this case. So is your argument essentially that he baited the trap for Judge Beislein and that this is really just a manipulative, clever defendant who is now essentially trying to take advantage of invited error? I wouldn't give Mr. Alexander that much credit. I think at the time he decided, hey, I want to keep the shackles. He had decided. He had made the determination that this was a conspiracy against him. He made all the motions leading in that direction. And this is the way he chose to go. But why would he ask to order a suit? That was a momentary – I would submit to you that was a momentary, yeah, yeah, give me a catalog. I'd like to get me a suit. And he thought about it, and then this thought vanished. He didn't go back to it. Well, if the judge says no, why would you go back to it? Well, the judge said, I'm not going to take care of your clothes. He did. He said that. He said that's not why. But if Mr. Alexander wanted clothes, he could have said, wait a minute, all right, let's address this, please. I want something to wear other than this. Was he required to do that to preserve – I mean, was he required to go that far to have the judge grant something he was entitled to under the law? I think he can – in Estelle Williams, the Supreme Court case, there was no mention of it at all, of the clothing. And that was okay, because the defendant never brought it up at all. Of course, the felon's case – But in this case, it was brought up by the defendant. The request was made clearly and explicitly. No. I think he – again, you have to understand Mr. Alexander, and you have to try and put yourself there when he's trading barbs and indulging in a half-hour conversation with a court. I think it was a momentary urge, and then it vanished. But a momentary urge that's cognizable under the law is still a right, isn't it? Well, again, I think you have to couple the clothing issue with the shackles, and Mr. Alexander was extremely clear about the shackles. So is your argument, one, that there was harmless error, or there was no error? Harmless error. Am I correct? I don't have the exact wording before me, but in the supplemental excerpt of record at 121 to 22, the district court, after saying, look, I'm not going to order you a suit, but if you want civilian attire, you're going to have to make those arrangements on your own. Did the judge tell him that? He did. And then Mr. Alexander responded something, well, I can't, and I'm just going to go with it, or words to that effect. Yes. All right. On the shackles, it seemed to me – I don't have the transcript in front of me right now, but when I read it before, it seems to me the implication of what he was saying to the judge was, no, I don't want any special treatment. And the judge says, well, we can take the shackles off. And he says, well, no, no, don't do anything special. I mean, I got the impression reading it that he was saying, no, don't make any special rules for me. And it seemed that ideally the judge should have come back and said, look, you have a constitutional right to have the shackles off. And, you know, that's that. It's not a special rule for you. No. But Mr. Alexander specifically said, I want to keep them. He said, I want them. He thought about it. And the more he thought about it, the more he decided that he wanted them, and he made that very explicit. I want to keep the shackles on. Well, I agree with you. Your shackle, that doesn't seem to add much that he wore a prison suit. He was – But, of course, we don't know that he was shackled. I'm sorry? I guess we don't know that he was shackled. I don't have any clear recollection of that. We do know that he didn't object to the shackles, at least that much is clear. Am I correct? He was – he conducted this trial himself. He was dressed the way he wanted to be dressed. And he had his own agenda. And I think he has that right. He made his decision about that. And the judge, when you read the record, the whole record, the judge bent over backwards for this guy. He spent a lot of time talking to him, trying to explain to him aspects of this thing. He was very courteous to him. Alexander got a fair trial. He got what he wanted. And he presented the defense that he wanted to present. Well, in all fairness, the judge didn't bend over backward on the clothing issue. He did not bend over backwards on the clothing issue. No, he did not. But he bent over backwards on the shackles issue. And he took real exception to Mr. Alexander wanting to wear those shackles, but Mr. Alexander was adamant about it. He bent over backwards. As a district court judge, I would have done a little more to try to convince him of the negative image that would have been portrayed by shackles and get a clear expression for him as to why he wanted the shackles. I don't think the judge bent over backwards on that issue either. Oh, I can't. I'm not going to argue to you that he bent over backwards on the clothing issue, but the subject did come up. And the shackles, I think, though, make this harmless. Are there any other questions? Does anybody have anything else? No. Anything else, Mr. Randall? Unless the Court has no further questions about this, the clothing issue, again, I think he that's the way he wanted it. Did he have any response to the search warrant issue? The search warrant issue, the failure to rule. Oh, well, I think he did rule. I think it's in our brief on page 19. The sites are there. I think that the district court did rule that he had accepted the magistrate judge's extensive report and recommendation on the search warrant. What is that in the record? What portion of the record are you relying upon? I'm looking at the page 19 of the government's brief, and the citations are issued above that. What is it? Can you give us the page number? Yes. It says volume 4, page 23-5, colon 10, and 6, colon 3-8, 28, colon 11. Is that volume 4, page 25, line 10? I'm sorry. It says the author of this brief says reporter's transcript, and then the FPTC, 4, colon 23-5, colon 10, and then 6, colon 3-8, semicolon, and then finally 28, colon 11-17. And as I say, the magistrate judge had an extensive hearing on this search warrant issue. Hearing from the man who took the counterfeit check with regard to the automobile repair and the detective, the Anchorage detective, who went to Judge Adams, stood before him personally and obtained the search warrant to search the vehicle. Mr. Randleif, for some reason, I'll have to check this when I get back to the office, but I have a supplemental excerpt of record, page 18, which I assume you filed. It also has a reporter's transcript number in the upper right-hand corner of page 5. And beginning at line 4, the district court says, and the motions that you're talking about, one is a witness at the evidentiary hearing. That issue is moved. The magistrate judge has ruled, I've accepted his decision, but you're entitled to that issue on appeal. You can, as you raise that issue on appeal, I'm going to stand by the magistrate judge with regard to that issue. Is that what you're referring to? I believe it is, Your Honor. I believe that's what the quote comes from. Counsel, did the magistrate judge rule on the Federal search warrant? I don't recall the ‑‑ I don't know if Mr. Alexander made an issue out of the Federal search warrant. The agent got a warrant for Mr. Alexander's luggage, and I don't know that Mr. Alexander challenged that. He challenged the state search warrant that got the government into the car. That was extensively litigated. But I don't ‑‑ I don't think he challenged the search warrant into the ‑‑ there were two pieces of luggage. He got two Federal warrants, and I don't think they were challenged. So the luggage was not in the car? No, the luggage was elsewhere. Elsewhere. Upon exit to record 39, it looks like he filed a motion for evidentiary hearing to suppress FBI search warrants. I'm sorry, Judge, the page is ‑‑ ER 39. Well, he certainly filed it. And the magistrate judge didn't rule on it. It does not appear. I don't have any recollection of what happened with regard to this. I don't remember any litigation of that particular warrant. Well, the reason I'm asking is because if the district court incorporated the recommendation of the magistrate judge and the magistrate judge didn't rule on the Federal warrant, then where does that leave us? Well, I'm assuming ‑‑ well, I don't know where it leaves us. I mean, I ‑‑ if Alexander made a motion ‑‑ Which it appears he did. Well, he made the motion. I don't know what the magistrate judge did with regard to that motion. Is this typical in Alaska judicial proceedings, or is this just unique to Mr. Alexander's case? I frankly am a little surprised at both the magistrate judge and the district judge here for not being a little more careful at making a clearer record and making sure that pretrial motions are disposed of in a way that at least is clear to the court of appeal. I think the ‑‑ in fact, the magistrate judge did. I can't put my finger on it. He did ‑‑ he did an excerpt of Record 35. There are a number of findings by the magistrate judge. Let me see. Is this Judge Roberts? This is Judge Roberts. There were a number of motions made, and I believe the magistrate judge ruled on all of them, because he is careful. Okay. I mean, he usually writes very long, very thorough, you know, fact and legal conclusion opinions, but so maybe the problem is either with Judge Beislein or his deputy clerk in not making clear entries in the docket so that we can figure out what happened. Well, here it is. Excerpt of Record, page 60, order regarding motion for evidentiary hearing. So the magistrate judge did decide. And that was on the Federal ‑‑ the challenge to the Federal search warrant. That's correct. No, no, no, no, no. This is on the evidentiary hearing, but not on the merits of the search warrant. Page 62 talks about the evidentiary hearing on the motion, but the ruling on the motion to suppress it is not in there. This is strictly on the request for an evidentiary hearing. But isn't that incorporating the same thing? Because he says he's filed a handwritten motion requesting an evidentiary hearing to suppress the FBI search warrants. And that's what he rules on. There's a difference between denying a request for an evidentiary hearing and denying the motion to suppress on the merits. Well, I ‑‑ This denies the request for an evidentiary hearing. It does not address the merits of the motion. Well, I'm assuming that what Judge Roberts did was he categorized this the way he wanted to, based on his experience with Mr. Alexander and based on all the pleadings that Mr. Alexander filed. But that's not responsive to Judge Rollins's question. Does the order address the merits, or does it simply say, no, I'm not going to give you an evidentiary hearing on it? Well, I guess the ‑‑ He says he's made an insufficient showing to entitle him to an evidentiary hearing on a motion to suppress the Federal search warrant. So you don't get a hearing. But that still doesn't address the merits of whether or not, as a matter of law, your objections are well taken. It just says I don't need to hold an evidentiary hearing to resolve contested issues of fact because you haven't presented any contested facts for me to resolve. That's correct. Well, there is ‑‑ there is a discussion in the magistrate's memo rejecting the evidentiary hearing. And it said, at the suppression hearing in the State warrants, there was a discussion of Alexander's efforts to seek suppression of Federal search warrants. The prosecutor advised the Court that he had not been served with those pages in docket number 71. This is the State search warrant. It referenced any Federal search warrant. Mr. Alexander was advised that if he was going to attack the Federal warrants, he would have to do so with some specificity and serve a copy of his papers on the government, transcript of evidentiary hearing, et cetera. Alexander's new motion still lacks specificity. The government opposes a request for a second evidentiary hearing. I don't know whether we ever got a ‑‑ whether anything further was resolved on the Federal ‑‑ Apparently not. But he's giving his reasoning. So what are we ‑‑ are we dealing with one of these pro se litigants who just, like, files papers right and left and, you know, buries the district court in it so that somehow things kind of got lost because Alexander didn't make it clear what it was he was asking for? He did a lot of filing. I won't say he buried the court, but he filed a lot of stuff. And I think the Court did the best with it that it could. And Judge Roberts apparently saw no merit. He said he wasn't specific in what he wanted to suppress or why. And the judge said you have to be more specific than that. You weren't. So I'm going to deny it. It doesn't take much to do a minute order denying it on the merits, though. Okay. Thank you, counsel. We'll hear if Mr. McKeown has rebuttal. Mr. McKeown. Thank you, Your Honor. Just briefly, I just thought I'd address a couple of factual issues mostly. The bail that Mr. Alexander was given was to a halfway house. He wasn't released out into the community. He was ‑‑ Well, but you don't dispute what was it, dirty urine or something that got him violated? Yeah. Then he got detained instead of being ‑‑ And then he was sent back to jail from the halfway house. Okay. You know, it was, yeah. So he got halfway to freedom until they blew it. Halfway, not ‑‑ All right. And the, you know, the Court's heard a lot of argument about the clothing. I think we have the clothing issue well in hand. I still am troubled, though, by the fact that even if there was a failure on the part of the district court to rule, you still haven't challenged the merits of the rulings themselves. And I'm troubled by the waiver argument. And if you have anything further to add on that, I'm all ears. But it's real interesting about the Federal warrants. There is no ‑‑ the way I remember it from reading the record, basically they have the evidentiary hearing. And Mr. Alexander says, well, there's the Federal warrants and the State warrants. The Court said, well, I don't see anything about the Federal warrants in your motion. And Mr. Alexander says, it's very hard to write motions in jail. I'm trying to type as best I can. The magistrate judge says, well, you do it handwritten, get it in. And he did that, and then it's not ruled on. That's what happened, basically. And the ‑‑ and I don't think he was the type of person who was doing thoughtless motions or burying the court. I mean, he had, you know, focused ideas and tried to do that as best he could. I think for pro se pleadings, there's ‑‑ Well, let me ask you this. If we were to grant you the relief that you're asking for, and we were to remand, I don't even know if this is possible procedurally, we would remand it to the district court, wouldn't we be doing it essentially to say, would you please enter a nunk protunk order that tells us what your ruling is on the case? Because if there is no challenge to the merits, it seems to me sort of a pointless remand for the court to say, I denied it, it's not meritorious, therefore the evidence comes in at trial, the jury verdict stands. But the thing is, Mr. Alexander filed objections. There are factual issues outstanding that have not been ruled on by the district court. I understand. But what if the ruling is the same? Where does that get Mr. Alexander? Well, where it gets him is ‑‑ Does it get him a new trial? Well, if the court, the way I would, what I'm asking as far as a remedy is if the, to remand on the motion, I hope to persuade the judge to reopen, to let me file something on the search warrant issues, because I think there's some issues about the impoundment of the vehicle, what authority the State officers had to impound the vehicle. But has it ‑‑ And I'm, I hope I've not waived anything here. Well, that's the issue, isn't it? I mean, he had his shot, and the magistrate judge said, whatever it is that you filed, you haven't established a prima facie challenge to, so that I can even address your, the merits of your attack on the warrant, and you don't raise those issues on appeal. It seems to me it would be a curious result for us to remand and essentially remand on an open record and say, let's just start all over again. But that's really what you just asked us to do. Well, I think ‑‑ Vacate the conviction and remand. As I see remands when cases are remanded, the trial, unless they're remanded instructions, that the trial court has discretion to allow issues to be reopened. And that's what I'm frankly banking on. Okay. Thank you very much. Thank you, Mr. McHugh. Thank you, Mr. Randall. The case just argued is ordered submitted, and we will now hear ‑‑
judges: Canby, Tallman, Rawlinson